WARSHAW BURSTEIN, LLP
Kimberly C. Lau, Esq. (KL-9374)
klau@wbny.com
Attorneys for Plaintiff
555 Fifth Avenue
New York, NY 10017
(212) 984-7709

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

| | |
|---|---|
| JOHN D. WALTER, | Civil Action No.:  18-cv-3060 |
| Plaintiff, | |
| -against- | **COMPLAINT** |
| QUEENS COLLEGE, FELIX V. MATOS RODRIGUEZ, PAMELA S. SILVERBLATT, CYNTHIA W. ROUNDTREE and GLENDA GRACE, | **Jury Trial Demanded** |
| Defendants. | |

--------------------------------------------------------------------X

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF SOUGHT

Plaintiff, JOHN D. WALTER ("Walter" or "Plaintiff"), by and through his undersigned

counsel, sues defendants, QUEENS COLLEGE, a New York State public college ("Queens

College"), FELIX V. MATOS RODRIGUEZ, in his individual and official capacity ("President

Matos Rodriguez"), PAMELA S. SILVERBLATT, in her individual and official capacity ("Vice

Chancellor Silverblatt"), CYNTHIA W. ROUNDTREE, in her individual and official capacity

("Roundtree") and GLENDA GRACE, in her individual and official capacity ("Grace")

(hereinafter collectively referred to as "Defendants"), and seeks damages, declaratory relief, and

permanent injunctive relief against Defendants, and any other and further relief that this Court

deems just and proper, and states as follows:

{1018625.2 }

## INTRODUCTION

1.      Walter was a well-loved and respected professor in the Queens College Aaron Copland School of Music.   Over the course of nine years at Queens College, Walter taught hundreds of students both in and outside of the classroom without incident.

2.      In 2015, Walter was diagnosed with chronic atrial fibrillation which subsequently required three (3) separate medical procedures for his heart condition.

3.      To prepare for his medical procedures, Walter was required to take three (3) different medications- Amiodarone, Warfarin and Diltiazem.   All of those medications have strong effects and well documented side effects, and Walter was naïve to each.

4.      As a result of his proscribed medications, Walter suffered from headaches, altered vision, nausea, fatigue, dizziness, anxiety, night sweats, day sweats and poor sleep.

5.      Due to the side effects of the prescribed medications, as well as the actual medical procedures performed to repair his heart damage and subsequent hospital stays, Walter experienced extreme discomfort and body pains.   Nevertheless, Walter continued teaching at that time.

6.      In addition to his classroom activities, Queens College required Walter to offer private voice lessons to students.   Pursuant to a longstanding practice at Queens College, private voice lessons take place off campus.

7.      During the fall semester of 2015, one Queens College student, herein identified as "Complainant[1]," registered to take 13 private voice lessons with Walter.   The private voice

---

[1] Education Law Article 129-B, § 6448 states "[p]ursuant to subdivision (i) of rule three thousand sixteen of the civil practice law and rules, in any proceeding brought against an institution which seeks to vacate or modify a finding that a student was responsible for violating an institution's rules regarding a violation covered by this article, the name and identifying biographical information of any student shall be presumptively confidential and shall not be included in the pleadings and other papers from such proceeding absent a waiver or cause shown as determined by the court." Although the instant action is not brought to vacate or modify a finding against a student, Plaintiff will nonetheless follow the rule of the law with respect to the complaining student.

lessons occurred at Walter's apartment, keeping with acceptable practices in the music department at Queens College.

8.      During one private voice lesson, while Walter was sitting at his piano, he verbally expressed discomfort in his neck while moving his head.  Complainant explained that she was experienced in therapeutically applying pressure to certain points on the neck with the tips of her fingers in order to relieve pain because she had done so for many years with her grandmother in South Korea.  Complainant also testified under oath that she offered and had had this experience.  While Walter sat at his piano, Complainant stood up and without invitation proceeded to use the tips of her thumb and index fingers to apply pressure to certain points on Walter's neck.  At the end of the lesson, Walter asked if she could repeat the procedure, and Complainant agreed.

9.      Complainant thereafter filed a complaint with Queens College, alleging that Walter had previously made comments of a sexual nature during private lessons, and alleged that on one occasion, Walter laid on a couch and insisted that Complainant give him "a massage."  These allegations are untrue.

10.     Among many other deficiencies, Queens College failed to provide Walter with adequate notice of the charges against him, failed to allow him the presence of union representation and failed to preserve all notes and records conducted during the investigation, in contravention of Queens College's own policies.

11.     Queens College ultimately found Walter in violation of its policies for allowing Complainant to use her thumb and index fingers to apply pressure to certain points of his neck, and terminated Walter's employment.

12.     Walter seeks redress against Defendants due to their actions, omissions, errors, and the flawed procedures, and/or negligence and overall failure to provide Walter with a

meaningful standard of due process and equity concerning the wrongful allegations of sexual misconduct made against him.   Walter also seeks redress for employment discrimination by Queens College against him on the basis of gender and disability pursuant to the New York City Human Rights Law.

## PARTIES

13.     Walter is, and all times relevant hereto, was a resident of Queens County, New York.

14.     Upon information and belief, at all times relevant hereto, defendant Queens College was and still is a Municipal Corporation existing pursuant to the Laws of the State of New York.

15.     Upon information and belief, at all times relevant hereto, defendant Queens College was and still is a public educational corporation duly organized and existing under and by virtue of the laws of the State of New York.

16.     Upon information and belief, at all times relevant hereto, defendant Queens College was and still is a member of the City University of New York.

17.     Upon information and belief, at all times relevant hereto, defendant Queens College was and still is a public benefit corporation existing pursuant to the laws of the State of New York.

18.     Upon information and belief, President Matos Rodriguez is an individual with a residence in Westchester County, New York.   At all times relevant hereto, President Matos Rodriguez was and remains President of Queens College and worked in Queens, New York.

19.     Upon information and belief, Vice Chancellor Silverblatt is an individual with a residence in New York County, New York.   At all times relevant hereto, Vice Chancellor

Silverblatt was and remains Vice Chancellor for Labor Relations for Queens College and worked in Queens, New York.

20.     Upon information and belief, Roundtree is an individual with a residence in New York County, New York.  At all times relevant hereto, Roundtree was and remains the Title IX Coordinator for Queens College and worked in Queens, New York.

21.     Upon information and belief, Grace is an individual with a residence in New York County, New York.  At all times relevant hereto, Grace was and remains General Counsel and Chief of Staff for Queens College and worked in Queens, New York.

## JURISDICTION

22.     This is an action for damages, declaratory relief, and injunctive relief.

23.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Walter states claims arising under the Constitution and laws of the United States, including 20 U.S.C. §§ 1681-88.  This court has jurisdiction over the state law discrimination claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

24.     This Court has personal jurisdiction over all Defendants because the acts or omissions giving rise to this Complaint occurred in Queens, New York.

25.     All conditions precedent to the filing of this action have occurred, accrued, or been waived as a matter of law.

## VENUE

26.     Pursuant to 28 U.S.C. § 1391, venue for this action properly lies in the U.S. District Court for the Eastern District of New York because the acts or omissions giving rise to this Complaint occurred in this district.

## GENERAL ALLEGATIONS

I.      **Walter's Employment with Queens College and Reliance on the Terms Described in Queens College's Policies and Procedures**

27.     Walter had been employed by Queens College as an adjunct lecturer in the Aaron Copland School of Music since the spring semester of 2006.

28.     From 2006 until 2016, Queens College renewed Walter's status as an adjunct lecturer.

29.     Over the course of those ten years, no student had ever complained about Walter's behavior, language or courses, and evaluations of his professorship by Queens College have been excellent.

30.     During his tenure as an adjunct lecturer, among other things, Queens College published a copy of The City University of New York Policy on Sexual Misconduct (the "Policies and Procedures") that Queens College's Board had adopted and approved.

31.     The Policies and Procedures also contained other policies, regulations, promises, and representations made by Queens College to its potential and actual students, administration and staff.

32.     The Policies and Procedures contained Queens College's policies regarding the resolution of gender-based misconduct complaints.

33.     In addition, Queens College and the Professional Staff Congress/CUNY ("PSC") are parties to a collective bargaining agreement governing the terms of Walter's employment with Queens College (the "CBA").  The CBA provides policies and procedures for, among other things, resolution of complaints made against adjunct lecturers.

34.     In consideration for the educational services provided by Walter, Queens College gave Walter assurances and promises that Queens College would follow and comply with the Policies and Procedures, as well as the CBA.

35.     Walter relied on these assurances and promises when accepting Queens College's offer of employment.

**II.     Walter's Diagnosed Heart Condition and Medical Treatment**

36.     During the summer of 2015, Walter was diagnosed with chronic atrial fibrillation, a type of heart arrhythmia that causes the top chambers of your heart, the atria, to quiver and beat irregularly.   Symptoms of chronic atrial fibrillation mimic those of a heart attack.   There is no cure for this chronic heart condition.

37.     As a result of this diagnosis, Walter was scheduled to have three (3) separate surgeries performed on his heart for the fall semester of 2015.   Walter made Queens College aware of his medical condition and upcoming surgeries, but was determined to continue teaching his students that fall despite his dire medical condition.

38.     In anticipation of his upcoming surgeries, Walter was required to take three (3) different medications- Amiodarone, Warfarin and Diltiazem.   Walter immediately began experiencing side effects from the medications, such as headaches, altered vision, nausea, fatigue, dizziness, anxiety, night sweats, day sweats and poor sleep.

39.     Between October and December 2015, Walter underwent three (3) separate surgical procedures.   The first two procedures, Electrical Cardioversions, took place in October and November 2015.   On December 4, 2015, Walter underwent a third and more invasive surgery at Mt. Sinai Hospital, a heart ablation through both of his femoral arteries up to his heart.

40.     After the third surgery, Walter was required to use a cane to assist in walking for at least two weeks.  Moreover, Walter was left in pain due to the swelling of his pericardium, the sac surrounding the heart.

41.     Additionally, Walter was prescribed additional medications including Amiodarone Hydrochloride, Xarelto, Diltiazem-Diltiazem and Colchicine.  Each of these medications had their own attendant side effects, many of which Walter experienced.

42.     Walter's pain was heightened due not only to the surgeries, but the subsequent, uncomfortable hospital stays.  In addition, the side effects of Walter's prescribed medications continued.

43.     As a result of the foregoing, by December 2015, Walter was experiencing severe pain, as well as chronic body aches resulting from the surgical procedures, medications and hospital bed stays.

**III.    Walter Teaches Complainant**

44.     During the fall semester of 2015, Walter taught a Jazz Ensemble class, as well as a class titled "Private Vocal Lesson."

45.     Private Vocal Lesson was a private, one-on-one session between Walter and students who wished to improve their vocal performances.

46.     Pursuant to a longstanding practice at Queens College, private lessons take place off campus, at a location selected by the faculty member.  Due to Walter's known medical condition, he conducted private voice lessons in his apartment, which he shared with a roommate.

47.     Walter's music studio, where he taught students, was a converted living room space, with a piano, a large chair, a sofa and a love seat.  Walter's roommate's bedroom is adjacent to his music studio.

48.     Complainant was a student in both Walter's Jazz Ensemble and Private Vocal Lesson classes.

49.     Complainant took her private vocal lessons at Walter's apartment during the fall 2015 semester.  During many such sessions, Walter's roommate, was present in the apartment, and she could overhear the activities occurring in the music studio.

50.     Complainant was entitled to take 13 hours of voice lessons, and according to her own statements, she enjoyed taking the private voice lessons.

51.     During one such lesson in or about November or December 2015, Walter was in noticeable discomfort and pain.  Walter's roommate was present in his apartment during these sessions.  As a result of the surgical procedures and adverse side effects of prescribed medications, Walter was having trouble sleeping and experiencing extreme body aches.  As a result, while sitting at the piano providing voice instruction to Complainant, Walter began rotating his neck to relieve some discomfort.

52.     While sitting at his piano, Walter began to wince and rub his neck, while verbalizing his pain and discomfort.  Complainant asked Walter what was wrong, and Walter explained that sitting up and providing instruction was causing him to experience pain in his neck.

53.     Complainant explained that her grandmother used to suffer from neck pain, and that as a result she learned how to apply pressure, using just her thumb and index fingers, to certain points on the neck to relieve pain.

54.     Complainant offered to use the same application of pressure points to Walter's neck to provide relief.  Complainant stood behind Walter and using the tips of her thumb and

index fingers, applied pressure to Walter's neck. Complainant did this for approximately 30 seconds.

55.     At the end of Complainant's private lesson, while still sitting at his piano, Walter asked her to once again use the tips of her thumb and index fingers to apply pressure to his neck, which Complainant did without hesitation. Once again, this lasted for less than one minute. At the conclusion of the private lesson, Complainant cordially left.

56.     Ultimately, Walter gave Complainant a B+ in both classes that semester. Complainant, however, was unhappy with her grade, which she felt should have been higher.

**IV.     Title IX Governs Queen College's Response to Complainant's Allegations**

57.     Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq*., and its implementing regulations, 34 C.F.R. Part 106 (collectively, "Title IX"), prohibit discrimination on the basis of sex in the operations of public or private colleges or universities that receive federal funds ("Recipients").

58.     Title IX governs the procedures that Recipients use to investigate and adjudicate allegations of sexual harassment. Recipients must adopt grievance procedures that are prompt, thorough, and equitable. Title IX provides that grievance procedures are not equitable if students do not know how the procedures work.

59.     Title IX imposes very specific procedural requirements on Recipients that investigate allegations of sexual harassment.

60.     Recipients must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

61.     Recipients must use a "preponderance of the evidence" standard to adjudicate complaints.

62.     Both the complainant and the accused must be afforded similar and timely access to any information that will be used at the hearing.

63.     Both the complainant and the accused must have the opportunity to present witnesses and other evidence.

64.     Investigation and hearing processes must be impartial, which requires disclosing any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties.

65.     Title IX requires public school Recipients to protect the due process rights of the accused party. In a proceeding investigating allegations of sexual harassment, rights established under Title IX must be interpreted consistent with federally guaranteed due process rights.

66.     Each Recipient must designate at least one employee to serve as a Title IX coordinator. The Title IX coordinator is responsible for overseeing all Title IX complaints, coordinating the Recipient's efforts to comply with and carry out the Recipient's Title IX responsibilities, and identifying and addressing any problems that arise during the review of such complaints.

67.     Title IX requires Recipients' employees to be sufficiently trained in compliance with Title IX's standards. Additionally, all persons involved in implementing a Recipient's grievance procedures (e.g., Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence as well as training in the recipient's grievance procedures.

**V.     Queens College's Policies and Procedures Governing Gender-Based Misconduct**

68.     At all relevant times, Queens College's Policies and Procedures contained written policies and procedures relating to allegations of gender-based misconduct.

69.    The Policies and Procedures expressly state that "[t]his is the sole policy at CUNY addressing sexual harassment, gender-based harassment and sexual violate and is applicable at all college and units at the University."

70.    The Policies and Procedures prohibit "sexual harassment, gender-based harassment and sexual violence against any CUNY student, employee or visitor."

71.    The Policies and Procedures define "sexual harassment" as follows:

**Sexual harassment** is unwelcome conduct of a sexual nature, including but not limited to unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, graphic and electronic communications or physical conduct of a sexual nature when:

(i)    Submission or rejection of such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing or is used as the basis for employment decisions or for academic evaluation, grades, or advancement (quid pro quo);

or

(ii)    Such conduct is sufficiently serious that it alters the conditions of, or has the effect of substantially interfering with, an individual's educational or work experience by creating an intimidating, hostile, or offensive environment (hostile environment).   The effect will be evaluated based on the perspective of a reasonable person in the position of a complainant.

72.    In that same section, the Policies and Procedures state that "[c]onduct is considered 'unwelcome' if the individual did not request or invite it and considered the conduct to be undesirable or offensive."

73.     The Policies and Procedures additionally state that "faculty members and other employees are prohibited from engaging in intimate relationships with students for whom they have a professional responsibility, including undergraduates, graduate and professional students and postdoctoral fellows."

74.     The Policies and Procedures list the following "examples of conduct that might constitute sexual harassment depending on the totality of circumstances":

- Inappropriate or unwelcome physical contact or suggestive body language, such as touching, groping, patting, pinching, hugging, kissing, or brushing against an individual's body;

- Verbal abuse or offensive comments of a sexual nature, including sexual slurs, persistent or pervasive sexually explicit statements, questions, jokes or anecdotes, degrading words regarding sexuality or gender, suggestive or obscene letters, notes, or invitations;

- Visual displays or distributions of sexually explicit drawings, pictures, or written materials; or

- Undue and unwanted attention, such as repeated inappropriate flirting, staring, or making sexually suggestive gestures.

75.     The Policies and Procedures additionally state that "faculty members and other employees are prohibited from engaging in intimate relationships with students for whom they have a professional responsibility, including undergraduates, graduate and professional students and postdoctoral fellows."

76.     The Policies and Procedures established the procedures by which Queens College investigates and adjudicates complaints of sexual harassment.  These procedures empower the Title IX Coordinator with exclusive control over both the substance and procedure of the investigation.

77.     The Policies and Procedures require complaints of sexual harassment to be referred to the Title IX Coordinator.

78.     The Policies and Procedures mandate that "[t]he college Title IX Coordinator *shall* inform *the respondent* that an investigation *is being commenced* and *shall* inform the respondent of the allegations of the complainant." (emphasis added.)

79.     The Policies and Procedures also mandate that the Title IX Coordinator "provid[e] the complainant and respondent with periodic updates of the investigation and notice of outcome of the investigation," and that she "maintain[] all documents of the investigation."

80.     According to the Policies and Procedures, "[f]ollowing an investigation, the College President may recommend that disciplinary action be commenced against the respondent student or employee."

81.     For discipline against employees, "the matter shall be referred for disciplinary action in accordance with the applicable CUNY policies, rules and collective bargaining agreements."

82.     Additionally, "[a] respondent employee who is covered by a collective bargaining agreement may consult with and have a union representative present at any interview conducted as part of such investigation."

83.     The CBA lays out a three-step process for grievances filed by an adjunct lecturer.

**VI.     Queens College's Sham Investigation and Findings**

84.     On January 8, 2016, Walter received email correspondence from defendant Cynthia W. Roundtree, Esq. ("Roundtree"), Queen College's Chief Diversity Officer and Title IX Coordinator.  The subject line of the message simply read "Confidential Matter."  In the body of the email, Roundtree wrote "I would like to schedule a meeting with you to discuss a confidential matter of importance."  Roundtree requested that Walter contact her administrative assistant to schedule a meeting.

85.     Roundtree's January 8, 2016 email correspondence did not state, much less even hint, that a complaint had been filed against Walter, that Queens College was investigating Walter for an alleged violation of its Policies and Procedures or that Walter was being investigated for an alleged "sexual assault."

86.     Walter initially called Roundtree's office upon receipt of her sparse email and scheduled a meeting.  Thereafter, Walter responded to Roundtree's email, stating that he was still recovering from his three surgeries and dealing with the subsequent discomfort and pain discussed herein.  Walter requested that an accommodation be made, and that Roundtree speak to him via telephone.  Walter's response expressly stated "[m]y employment is not in jeopardy, so I don't understand why I am being summoned with no explanation."

87.     Roundtree, ignoring Walter's documented medical issues, declined his request for a disability accommodation and demanded that Walter appear in person.  However, Roundtree continued to refuse to provide Walter with notice of why she wanted to meet with him, or the fact that he was under investigation by Queens College.

88.     Because Roundtree refused to inform Walter that he was under investigation by Queens College for a violation of its Policies and Procedures, Walter did not bring a union representative to his meeting with Roundtree, as was his right pursuant to the CBA.

89.     At this time, Roundtree's communications with Walter were limited solely to email correspondence.  At no time did Roundtree discuss Complainant's allegations over the telephone with Walter.

90.     Unbeknownst to Walter, on December 17, 2015, another Queens College professor, and not Complainant herself, made a report to Roundtree.  Thereafter, on December 22, 2015, Complainant met Roundtree and discussed her claims for the first time.

91.     During her meeting with Roundtree, Complainant allegedly stated that Walter had previously made comments of a sexual nature during the private lessons, and alleged that on one occasion, Walter laid on a couch and insisted that Complainant give him "a massage." These allegations are untrue.

92.     After her initial meeting with Complainant, Roundtree did not inform Walter that he was under investigation by Queens College, nor did Roundtree inform Walter that serious allegations of gender-based misconduct had been leveled against him.   Instead, Roundtree contacted the chair of the Aaron Copland School of Music.

93.     The chair of the music school was unaware of Complainant's allegations against Walter.  The chair informed Roundtree that teaching private lessons to graduate music students at off-campus locations is a long-standing practice at Queens College.  The chair stated that the fees paid to adjunct professors do not justify the time and expense of traveling to campus to teach private lessons.  This practice, according to the chair, has existed for many years with the knowledge of prior presidents and provosts of Queens College.

94.     Walter met with Roundtree in her office on January 12, 2016.  At no time during his meeting with Roundtree was Walter ever provided with a "written summary of the allegations of the complaint," as mandated by Queens College's Policies and Procedures.

95.     During their January 12, 2016 meeting, Roundtree verbally informed Walter that allegations had been made against him by a student alleging the use of unwelcome comments of a sexual nature and asking her to massage his neck while he lay on the couch.

96.     Walter denied making any comments of a sexual nature, denied that he received "a massage," and denied that any activity with any student occurred on a couch.

97.     Walter did recall that on one occasion, a student noticed his pain and discomfort and offered to use the tips of her thumb and index fingers to apply pressure to certain points on his neck.  However, Walter steadfastly maintained, as he has always done, that this occurred while sitting at the piano, and not on his couch.

98.     Roundtree never asked Walter to identify or provide the names of any witnesses. Nor did Roundtree ever inform Walter during their meeting that it was an investigatory interview, that it was disciplinary or that it was official.  As a result, Walter left Roundtree's interview completely confused about what was going on.

99.     Thereafter, Roundtree conducted interviews of two students identified as "witnesses" by Complainant.  Neither student, however, was present during the private lessons. Roundtree interviewed them both nevertheless.

100.    For one student, identified herein as "Student C," Roundtree admittedly conducted her interview with Complainant, Student C, in the same room.  Complainant sat next to Student C during "the entire interview" according to Roundtree.

101.    Student C had taken classes taught by Walter in the spring 2015 and fall 2015 semesters.  According to Student C, Walter "never engaged in inappropriate conduct towards" her.  Student C did not report hearing any comments of a sexual nature from Walter, and instead simply recalled that Walter "stated that his ex-girlfriend was Japanese" and that Walter disclosed in class information about his heart condition.

102.    Student C's entire interview with Roundtree consisted of nothing more than recalling what Complainant told Student C about her allegations.

103.    Roundtree also interviewed Complainant's witness identified herein as "Student B."  Incredibly, Roundtree conducted her interview with Student B over the telephone due to

Student B's "inability to travel to campus during the winter-break," despite denying Walter the same accommodation due to his known disability.

104.    Like Student C, Student B recounted Complainant's allegations.  Student B also claimed that Walter made sexual comments during two (2) private lessons with her.  These allegations, while false, clearly tainted Roundtree's investigation.

105.    Roundtree interviewed a third student at Complainant's request, herein identified as "Student A," who like Student C, expressly stated that she was enrolled in classes with Walter but never heard him make any inappropriate comment.

106.    On January 14, 2016, Roundtree again interviewed Complainant.  During that meeting, Complainant represented to Roundtree that she generally taped her private lessons, and that those tapes should contain inappropriate comments made by Walter.  In fact, however, Walter requires *all* of his students to record their lessons.

107.    During her January 14, 2016 meeting, Roundtree actively solicited Complainant to identify more witnesses.  At that time, Complainant identified Student A.

108.    At that time, Walter was also informed by one of his students that Complainant, herself, had physically and sexually assaulted said student.  Walter was further informed that Complainant had been dismissed from a prominent jazz club as an intern for harassing another employee.  Walter made Roundtree aware of all of the foregoing.

109.    On January 19, 2016, Roundtree sent Complainant an email stating "I would like to complete the investigation as soon as possible.  Were you able to review the contents of your recordings/tapes that we discussed in our meetings on 1/14/16?  Also, are there any additional witnesses that you would like me to interview?"

110.   On January 19, 2016, Complainant responded to the email "Thank you for reminding me!"

111.   However, Complainant failed to produce any of the alleged recordings validating her claims.   Accordingly, on January 22, 2016, Roundtree again asked Complainant for the alleged recordings validating her claim.

112.   In response, Complainant sent Roundtree an email stating, in part, "I only completed two hours of the recording review… I stopped doing it a while ago because I found myself pretty depressed after doing it."

113.   Despite a complete absence of any evidence to validate Complainant's claims, on that same day, Roundtree responded to Complainant's email, in part, "Please do not worry and do not continue searching for the information if the search is causing you to become depressed . . . Again it is not required that you continue to search for the additional information."

114.   Complainant's failure to deliver on her promise to produce audio-taped evidence of her claims notwithstanding, on January 26, 2016, Roundtree issued a written report.

115.   Roundtree's January 26, 2016 written report was never sent to Walter.

116.   Roundtree's report does not indicate that she interviewed any witness for Walter, only witnesses provided by Complainant.   However, none of Complainant's witnesses were able to validate any of Complainant's allegations.

117.   In her report, Roundtree concluded that both the allegation made by Complainant that Walter touched her knee during private lessons and "[t]he allegation that while the [C]omplainant massaged [Walter's] neck, he laid face-down on a couch and moaned loudly could not be substantiated." [emphasis in original].

118.    However, despite all of the foregoing, Roundtree substantiated Complainant's claim that Walter "asked the complainant to massage his neck" and that Walter made unwelcome comments of a sexual nature to students during private lessons and Voice Ensemble classes.

119.    Both of these charges lacked any evidence, similar to the unsubstantiated charges.

120.    Moreover, despite Roundtree's false characterizations of what happened in his apartment, Walter never referred to Complainant's 30 second pressing of fingers into his neck as "a massage."

121.    Additionally, considering that Roundtree never interviewed students from Walter's Voice Ensemble classes, aside from the three students cherry-picked by Complainant, and the fact that two (2) of Complainant's three (3) witnesses denied hearing any inappropriate comments of a sexual nature from Walter, substantiating Complainant's claims of inappropriate comments was shocking to the conscious.

122.    Equally disturbing, Roundtree's report does not mention her receipt of statements from Walter's students exonerating his behavior, nor does she state that she reviewed or considered these statements during her investigation of Walter.

123.    Even more shocking was Roundtree's characterization of Complainant using her thumb and index fingers to press on Walter's neck as "a massage," and Roundtree's statement that Walter requested the "massage" despite Walter's consistent statements to the contrary that Complainant offered to perform the task that was never requested.

124.    On January 27, 2016, defendant Matos Rodriguez, president of Queens College, terminated Walter's employment with Queens College.  This decision was transmitted to Walter by letter from Roundtree dated February 8, 2016.

125.   Neither Roundtree, Matos Rodriguez, nor any other person at Queens College provided Walter with a copy of Roundtree's Investigative Report.

**VII.   Walter's Grievances**

126.   On January 28, 2016, pursuant to the CBA, PSC filed a Step One grievance with Queens College on behalf of Walter.  The Step One grievance alleged "improper discharge without just cause."  PSC demanded that Walter be reinstated and awarded back pay for the Spring 2016 semester.

127.   A meeting was held on March 24, 2016 with Walter, a PSC representative, counsel for Queens College, and defendant Grace, who was acting as "the President's designee" for purposes of the Step One grievance.

128.   One day before that meeting, on March 23, 2016, Queens College provided a copy of Roundtree's investigative report to PSC, but still refused to provide Walter with a copy.

129.   By written decision dated April 14, 2016, Grace affirmed Walter's termination. According to Grace's decision, Walter advanced three (3) arguments during the Step One grievance: "1) he claims the College did not have just cause to remove him from his position at the College; 2) he claims that he was denied due process; and 3) he claims that the [Title IX Coordinator's] investigation was improper."  Grace rejected all of Walter's arguments.

130.   With respect to Walter's claim that Queens College did not have just cause to terminate his employment, Grace concluded that the Title IX officer "substantiated that [Walter] had ***engaged in the behavior that constituted sexual harassment*** under the CUNY Policy." However, Grace failed to explain how accepting therapeutic placement of fingers on one's neck for 30 seconds constituted conduct of a "sexual nature" under the Policies and Procedures.

131.   With respect to Walter's due process claims, Grace, an attorney admitted in the State of New York, dismissed Walter's claims because Roundtree's conclusion "was supported

by two students indicating that [Walter] made inappropriate comments of a sexual nature, and

[Walter's] having requested a massage from Complaining Student."

132.    However, only **one** of Complainant's *three* witnesses made any allegation of

inappropriate comments during a private lesson, and **none** of Complainant's witnesses

substantiated that Walter "requested a massage" from Complainant.

133.    Moreover, none of the above had anything to do with Queens College's denial of

due process to Walter, Queens College's failure to provide adequate notice, Queens College's

failure to consider witnesses on behalf of Walter, or Queens College's failure to allow Walter to

have a union representative present during all interviews.

134.    Finally, with respect to Walter's third argument, that Roundtree's investigation as

improper, Grace dismissed without consideration any claims of bias.

135.    Grace then took it upon herself to go a step further an include a section of her

decision assailing Walter's credibility.

136.    For example, Grace found Walter's credibility lacking because at his only

interview with Roundtree, he "did not recall whether his roommate was present during any of his

private lessons with" Complainant, according to Roundtree.  But, as Grace observed "[a]t the

[Step One] Meeting, [Walter] asserted that his roommate was in fact present for all lessons."

137.    Grace took it upon herself to cast aspersions on Walter's character based on clear

memory lapses he had during an interview with Roundtree which, as Grace was well aware,

Walter attended without any forewarning of the nature of the claims made against him.

Nevertheless, Grace found that inaccuracies of memories which Walter was called on the spot to

recall, rather than after he was given some time to think of an incident he hadn't considered since

it happened, was sufficient enough to merit written commentary.

138.    Thereafter, on May 12, 2016, through independently retained counsel, Walter filed a Step Two Grievance. This grievance was heard by defendant Silverblatt.

139.    For the Step Two Grievance hearing, Walter obtained written statements from students of his music classes, denying any appropriate behavior by Walter and further denying that Walter makes inappropriate comments of a sexual nature during class. Additionally, a Queens College student testified during the Step Two Grievance hearing about Complainant's previous sexual assault against her.

140.    Once again, Walter asserted that Queens College denied him due process, that Roundtree's report was biased and incomplete, and that a preponderance of the evidence did not cut against Walter. Walter further complained about Grace's unnecessary, unrequested and unsupported credibility determinations.

141.    Walter's Step Two grievance expressly stated that Queens College's actions violated Title VII, the Americans with Disabilities Act, 28 U.S.C. § 1983, Title IX and the New York State and New York City Human Rights Laws.

142.    On June 17, 2016, a Step Two meeting was held by Sandy A. Curko, who did not write the actual Step Two decision. The meeting was also attended by Walter and his counsel, Grace, Roundtree and Walter's roommate.

143.    On September 6, 2016, Silverblatt issued her Step Two decision, affirming Walter's termination. Silverblatt's decision consisted of six (6) pages, but only the last page was dedicated to her findings and conclusions.

144.    Incredibly, Silverblatt found that "Ms. Roundtree's investigation had concluded that [Walter] had ***inappropriately touched the Complainant-student*** . . . ."

145.    However, Roundtree's Investigative Report affirmatively states the opposite: "[t]he allegation that the respondent touched the complainant during private lessons which were conducted in his studio, and on one occasion he tapped her knee, <u>could not be substantiated</u>." (emphasis in original).

146.    Silverblatt also falsely stated that Walter "admitted [to Roundtree] that he had asked the Complainant to give him a massage during one of her private voice lessons at his home." However, Walter never admitted that.

147.    It was clear that Silverblatt did not actually read any documents in Walter's file.

148.    Pursuant to the CBA, Silverblatt was supposed to render her decision on Walter's Step Two grievance by July 18, 2016. However, because she dragged her feet in issuing a decision, Walter, pursuant to the CBA, filed a Step Three grievance.

149.    Pursuant to the CBA, Queens College and PSC have jointly agreed to a panel of mediators on rotation. According to the CBA, "[t]he disciplinary arbitrator's decision regarding guilt or innocence and the sufficiency of grounds for the penalty shall be final and binding upon the parties."

150.    The Step Three grievance took place over the course of two days, March 9, 2017 and April 17, 2017.

151.    By written decision and order dated May 15, 2017, Walter's Step Three grievance was denied.

152.    In her decision, the Step Three arbitrator wrote:

> As a preliminary matter, it is important to emphasize that this case is about whether the College had just cause to terminate [Walter's] employment as an adjunct professor in the School of Music. It is not about whether Roundtree followed all the rules and regulations of Title IX in her investigation. Nor is it about whether [Walter] engaged in conduct sufficiently severe or pervasive to establish

> sexual harassment under Title VII or similar statutes.  Summarized broadly, at issue in this case is whether [Walter] engaged in misconduct in violation of CUNY policy, whether he was afforded due process under basic just cause principles and whether the penalty imposed was appropriate for the proven misconduct.

153.   The Step Three grievance arbitrator's decision further confuses and obfuscates exactly what provision of the Policies and Procedures Walter is alleged to have violated.  For example, her decision states that "[e]ven if I accept [Walter's] own version of events . . . his conduct still constitutes inappropriate physical contact with a student and demonstrates a serious lack of judgment for an adjust professor."  In other words, it is not that Walter's conduct violated the Policies and Procedures, it is that Walter's conduct violated the arbitrator's own person sense of justice.

154.   The decision further opined that "[a]s a teacher, [Walter] should have immediately stopped [Complainant] when she 'voluntarily' touched him to massage his neck, and moreover, should not have asked that she do it again."  However, there is nothing in the Policies and Procedures that states, let alone even implies this.

155.   Importantly, the decision states: "that [Walter] viewed the massage as therapeutic and not sexual Walters not require a finding that his conduct did not violate the Policy on Sexual Misconduct.  Under the policy, sexual harassment is broadly defined.  It is unwelcome conduct of a sexual nature . . . ."  However, the decision fails to elucidate how the conduct at issue was "sexual."

156.   In fact, the arbitrator assumed facts that had already been rejected by Roundtree's Investigative Report.  Specifically, Roundtree found that Complainant's allegation that the application of pressure to Walter's neck occurred on the coach, and that Walter moaned to be unsubstantiated.  Yet, the Step Three grievance decision is replete with this as a factual finding.

157.    The decision also found that despite Queens College's failure to provide proper notice to Walter, and despite Queens College's absolute failure to follow its own Policies and Procedures, Walter still received due process because Grace, Silverblatt and the Step Three grievance provided Walter "an opportunity to be heard," completely missing the point of due process safeguards.

158.    The Step Three decision has never been confirmed by Queens College.

**VIII.   Queens College's Illegal Conduct Has Irreparably Damaged Walter's Career and Professional Reputation**

159.    As a result of Queens College's failure to provide Walter with due process and failure to follow its own Policies and Procedures, Walter has not been terminated due to a sexual assault.

160.    To date, Walter has been unable to obtain adequate and comparable employment.

161.    Furthermore, any employer to which Walter applies will require a background check that would reveal Queens College's unfounded grounds for termination.

162.    Defendants' illegal actions have wrongfully deprived Walter of the value of the services that he provided to Queens College.

163.    Without appropriate redress, the unfair and illegal outcome of Queens College's sham investigation and sanction will continue to cause irreparable damage to Walter.

<u>Causes of Action</u>

**Count I. Violation of Procedural Due Process Rights Pursuant to 42 U.S.C. § 1983**

164.    Walter repeats and realleges each and every allegation hereinabove as if fully set forth herein.

165.    This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Defendants.

166.   Walter has a protected property and liberty interest in his reputation under the Due Process Clause of the Fourteenth Amendment.

167.   The Defendants' actions deprived Walter of his property and liberty interest in his reputation without constitutionally-adequate pre-deprivation or post-deprivation process.

168.   Specifically, Defendants enacted and enforced the Policies and Procedures so as to deprive Walter of his due process rights.

169.   Walter's employment was terminated due to an impermissibly vague definition of "sexual harassment" and "sexual nature" in their Policies and Procedures.

170.   Moreover, Defendants repeatedly failed to abide by the terms of their Policies and Procedures.

171.   Because of Defendants' actions, Walter has suffered, and continues to suffer, irreparable injury that cannot be fully compensated by an award of monetary damages.

172.   Defendants have damaged Walter by depriving him of his constitutional rights.

173.   At all relevant times, Defendants acted under color of state law.

174.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Walter is entitled to an injunction invalidating and restraining enforcement of the Defendants' unconstitutional Policies and Procedures.

175.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Walter is entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

**Count II. Violation of Substantive Due Process Rights Pursuant to 42 U.S.C. § 1983**

176.   Walter repeats and realleges each and every allegation hereinabove as if fully set forth herein.

177.   This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Defendants.

178.    Defendants' enactment and enforcement of the Policies and Procedures deprived Walter of his constitutionally-protected property and liberty interest in his reputation.

179.    Defendants' actions in enacting and enforcing the Policies and Procedures were the product of arbitrary state action rather than a conscientious, careful, and deliberate exercise of professional judgment.

180.    The Defendants' actions were so lacking in any legal justification or factual basis, so falsely created and so deliberately injurious to Walter that they shock the conscience and violated Walter 's substantive due process.

181.    At all relevant times, Defendants acted under color of state law.

182.    Defendants have damaged Walter by depriving him of his constitutional rights.

183.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Walter is entitled to an injunction invalidating and restraining enforcement of the Defendants' unconstitutional Policies and Procedures.

184.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Walter is entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

185.    Walter requests that all matters related to liability and his damages be tried before a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John D. Walter demands judgment against Defendants, and order relief against the Defendants as follows:

(i)    That this Court issue preliminary and permanent injunctive relief restraining Defendants (1) from making any notation in Plaintiff's employment records; (2) from retaining any record related to Plaintiff's disciplinary hearing in his employment records due to

Defendants' flawed disciplinary process and erroneous finding that Plaintiff violated the Policies and Procedures; and (3) from reporting any record of Plaintiff's disciplinary hearing in response to third party inquiries.

(ii)     That this Court issue a declaration pursuant to 28 U.S.C. § 2201 that: (i) the outcome and findings made by the Defendants be reversed; (ii) John Walter's reputation be restored; (iii) John Walter's disciplinary record be expunged; (iv) any record of the complaint against John Walter be permanently destroyed; and (vi) Queens College's rules, regulations and guidelines are unconstitutional as applied.

(iii)     awarding John Walter such other and further relief as the Court deems just, equitable and proper.

Dated: New York, New York
     May 21, 2018

WARSHAW BURSTEIN, LLP
*Attorneys for Plaintiff*

By: _____
     Kimberly C. Lau
     John E. Greene
     555 Fifth Avenue
     New York, New York 10017
     (212) 984-7700
     klau@wbny.com