UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
JOHN D. WALTER,

                          Plaintiff,

      - against -

QUEENS COLLEGE, FELIX V. MATOS
RODRIGUEZ, PAMELA S. SILVERBLATT,
CYNTHIA W. ROUNTREE and
GLENDA GRACE

                        Defendants.
--------------------------------------------------------------- x

**MEMORANDUM & ORDER**

18 CV 3060 (RJD) (SLT)

DEARIE, District Judge:

On January 27, 2016, Plaintiff John D. Walter ("Plaintiff" or "Walter") was terminated from his position as an adjunct lecturer at the Aaron Copland School of Music at Queens College ("College") after serving in the position for over nine years. Walter taught a variety of music courses to hundreds of students, including one called "Private Vocal Lesson," which, as a matter of practical necessity and longstanding College practice was held off campus because in the College's view, the fees paid to adjunct professors were not enough to justify the expense of traveling to campus for private lessons. Walter, who suffered from chronic atrial fibrillation, held lessons at his apartment, which he shared with a female roommate. Walter's termination came after an allegation surfaced that he had engaged in sexually inappropriate conduct during a private vocal lesson in violation of the College's Policy on Sexual Misconduct ("Policy"). Prior to the single in-person meeting where Walter was made aware of the allegation, he received no information about the nature or subject of the meeting, and at no time was Walter informed that he faced termination. On January 26, 2016, two weeks after Walter's only in-person meeting, which he attended alone, without a Union representative as was his right pursuant to his

Collective Bargaining Agreement ("CBA"), the College's Title IX coordinator, Defendant Rountree, issued a written report regarding the allegation. The next day Walter was terminated. Walter subsequently contested his termination through a three-step grievance procedure pursuant to his CBA. The appeals were unsuccessful.

Walter now brings procedural and substantive due process claims pursuant to 42 U.S.C. § 1983 against Queens College and various Queens College employees (together, "Defendants"). Specifically, Walter's procedural due process claims arise under two theories: (i) the College's Policy regarding sexual misconduct is vague as applied to his alleged conduct and failed to put Walter on notice that his alleged conduct constituted a Policy violation, and (ii) the Defendants failed to afford Walter constitutionally adequate pre- or post-deprivation process. Defendants move to dismiss the complaint against Queens College on the grounds of Eleventh Amendment immunity and against all Defendants for failure to state a claim. For the reasons that follow, Defendants' motion is granted with respect to Queens College and Walter's substantive due process claim and denied with respect to Walter's vagueness and pre-deprivation procedural due process claims.

## BACKGROUND

I.      The College's Policy on Sexual Misconduct

The Policy on Sexual Misconduct states, in relevant part, "[t]his policy prohibits sexual harassment, gender-based harassment and sexual violence" and explains that "[s]exual harassment includes unwelcome conduct of a sexual nature, such as unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, graphic and electronic communications or physical conduct that is sufficiently serious to adversely affect an individual's participation in employment, education or other CUNY activities." Defs.' Br., Ex. C, ECF No. 30-3. The policy

2

goes on to explain that conduct is considered "unwelcome if the individual did not request or invite it and considered the conduct to be undesirable or offensive." Id. For example, the policy notes that "inappropriate or unwelcome physical contact or suggestive body language, such as touching, groping, patting, pinching, hugging, kissing, or brushing against an individual's body" as well as "verbal abuse or offensive comments of a sexual nature, including sexual slurs, persistent or pervasive sexually explicit statements" or "undue and unwanted attention" including "making sexually suggestive gestures" are circumstances that might constitute sexual harassment "depending on the totality of the circumstances." Id.

II.     Events Leading to Walter's Termination

As part of his course in the fall 2015 semester, Walter provided one-on-one tutorials in his home, consistent with long-standing College practice and because "the fees paid to adjunct professors do not justify the time and expense of traveling to campus to teach private lessons." Complaint, ECF No. 1, at ¶¶ 6, 93. At the end of the semester, while hosting a female student for a vocal lesson, Walter began experiencing acute physical symptoms and physical pain including body aches and neck pain—side effects of certain medications he was prescribed following three different surgeries related to his chronic atrial fibrillation. Id. ¶¶ 51. As alleged in the Complaint, Walter expressed his physical pain to his female student, who responded by voluntarily offering to apply pressure to his neck to relieve the pain using a technique she learned from her grandmother. Id. ¶¶ 8, 53. Walter alleges the student stood up from the piano, where he and the student were sitting, stood behind him and applied pressure to his neck using her thumb for less than one minute. Id. ¶¶ 8, 54. At the end of the vocal lesson, Walter asked the student to apply pressure to his neck a second time and the student allegedly obliged "without hesitation," and applied pressure again for less than one minute. Id. ¶ 55. The student left

3

Walter's apartment. She ultimately received a B+ in her vocal class, which she was allegedly "unhappy with" and "felt should have been higher." Id. ¶ 56.

On December 22, 2015 the student met with the College's Title IX coordinator, Rountree. The student claimed that while in Walter's apartment for a vocal lesson, Walter made comments to her "of a sexual nature" and "on one occasion laid on a couch and insisted that she give him a massage." Id. ¶ 91. Rountree emailed Walter on January 8, 2016, requesting an in-person meeting "to discuss a confidential matter of importance." Id. ¶¶ 84, 86. When Walter asked if he could participate in the meeting by telephone in light of his medical condition, he stated "my employment is not in jeopardy, so I don't understand why I am being summoned with no explanation." Id. ¶ 86. Rountree did not respond to Walter's statement and "refuse[d] to provide Walter with notice of why she wanted to meet with him, or the fact that he was under investigation by Queens College." Id. ¶ 87. Walter met with Rountree on January 12, 2016, and was told, for the first time, that he was under investigation by the College for a violation of its Policy on Sexual Misconduct, and in particular its prohibition on making unwelcome comments of a sexual nature and for asking a student "to massage his neck while he lay on the couch" in his home. Id. ¶ 95. However, Rountree did not provide Walter with a "written summary of the allegations" "as mandated by Queens College's Policies and Procedures." Id. ¶ 94. Walter denied the allegations and claimed that he never received a "massage" on his couch. Id. ¶ 96. He admitted that the student applied pressure to his neck while they sat at the piano. Id. ¶ 97. Walter left the meeting and was never asked to identify or provide any names of any witnesses. Id. ¶ 98. Walter alleges he left the meeting "completely confused about what was going on." Id. At some point following Walter's meeting with Rountree, but before his termination, Walter learned, and subsequently notified Rountree, that the complaining student had "physically and

4

sexually assaulted" another student and "had been dismissed from a prominent jazz club as an intern for harassing another employee." Id. ¶ 108. The complaint does not make any allegations with respect to whether Rountree investigated or substantiated those allegations in compiling her report.

After the meeting with Walter, Rountree concluded her investigation by interviewing three other students—who were identified as "witnesses" by the complaining student but were not actually present during her private lessons—and conducted an additional interview of the complaining student. Id. ¶ 99, 105. One witness, whom Rountree interviewed while the complaining student sat in the same room, recalled what the complaining student said about Walter but claimed Walter "never engaged in inappropriate conduct" towards her, did not report hearing Walter make any comments of a sexual nature in her presence and could only recall that at one point Walter "stated that his ex-girlfriend was Japanese." Id. ¶ 101. Another student similarly recounted the complaining students' allegations and claimed that Walter made "sexual comments" to her during two private lessons. Id. ¶ 104. The third student stated she never heard Walter make any inappropriate comments. Id. ¶ 106. Thereafter, the complaining student advised Rountree that she kept audio recordings of her vocal lessons that should contain inappropriate comments.[1] Id. ¶ 106. The student never provided Rountree with any recordings, claiming that after about two hours of review of the recordings she found herself "pretty depressed" and stopped searching. Id. ¶ 112. Rountree made no attempts to secure these critical recordings. Id. ¶¶ 113-14.

Rountree prepared a written report, dated January 26, 2016, which was never disclosed to Walter. Id. ¶¶ 114-15. The report concluded that the complaining student's allegations regarding

---

[1] Walter alleges he requires all of his students to record their lessons.

knee touching and massaging while Walter lay face down on the couch and moaned loudly could not be substantiated. Id. ¶ 117. Rountree did, however, credit the student's claim that Walter asked her "to massage his neck" and "made unwelcome comments of a sexual nature" while sitting at the piano. Id. ¶ 118. Notwithstanding the fact that Walter was never "provided with a written summary of the allegations" against him, the next day, the President of Queens College terminated Walter's employment. Id. ¶ 124. That decision was formally transmitted to Plaintiff via letter from Rountree on February 8, 2016. Id.

### III. Events Following Walter's Termination

Following his termination, Walter commenced the three-step grievance process outlined in his CBA. He filed a "Step One" grievance on January 28, 2016, contesting his allegedly "improper discharge without just cause." Id. ¶ 126. The grievance demanded Walter be reinstated and awarded back pay for the spring 2016 semester. Id. Walter participated in a "Step One" grievance meeting on March 24, 2016, along with a Professional Staff Congress ("PSC") representative and Defendant Grace, acting as "the President's designee." Id. ¶ 127. After the meeting, Grace concluded that the College had just cause to terminate Walter given the fact that Rountree substantiated a student's claim that Walter engaged in behavior constituting sexual harassment under the Policy. Id. ¶ 129. Grace did not provide any factual basis or reasoning supporting this conclusion. Id. ¶ 130. Grace also concluded that Rountree's findings revealed Walter received due process pre-termination because the student's complaint was corroborated by "*two students* indicating [Plaintiff] made inappropriate comments of a sexual nature and Walter's having requested a massage from the Complaining Student," even though only one of the three witnesses said Plaintiff had previously made inappropriate comments of a sexual nature. Id. ¶¶ 130-32.

On May 12, 2016, Walter filed a "Step Two" grievance under the CBA with the assistance of independently retained counsel. Id. ¶ 138. The grievance meeting was held by Sandy A. Curko but a decision was ultimately issued by Defendant Silverblatt, who was not present at the "Step Two" meeting. Id. At his "Step Two" grievance hearing on June 17, 2016, Walter, for the first time, introduced written statements from his own witnesses—students who denied inappropriate behavior by Walter, including making comments of a sexual nature as well as the testimony of a College student who said the complaining student had sexually assaulted her. Id. ¶ 139. Silverblatt issued a decision on September 6, 2016. Id. ¶ 143. Silverblatt's decision noted that Rountree's investigation concluded Walter "had inappropriately touched the complainant," which Walter contends is inconsistent with the findings in Rountree's report—that Walter "asked the complainant to massage his neck" and made unwelcome comments of a sexual nature but the complainant's allegation that Plaintiff "touched" her and "on one occasion tapped her knee" could not be substantiated. Id. ¶¶ 144-45. Walter also alleges that Silverblatt's decision falsely stated Walter admitted he asked the complainant to give him a massage at his home, even though Walter specifically stated to Rountree that he asked the complainant to apply pressure to his neck after she made an initial offer, and he did not ask her to give him a "massage." Id. ¶ 146.

Walter filed a "Step Three" grievance and participated in a hearing held on March 9, 2017 and April 17, 2017. Id. ¶ 150. The CBA provides for arbitration at the "Step Three" stage and states that "the disciplinary arbitrator's decision regarding guilt or innocence and the sufficiency of grounds for the penalty shall be final and binding upon the parties." Id. ¶ 149. On May 15, 2017, the arbitrator denied Plaintiff's "Step Three" grievance. Id. ¶ 151. The arbitrator noted, in relevant part, "at issue in this case is whether [Plaintiff] engaged in misconduct in

violation of CUNY policy, whether he was afforded due process under basic just cause principles and whether the penalty imposed was appropriate for the proven misconduct." Id. ¶ 152. The arbitrator concluded that even if Walter viewed the touching as "therapeutic" rather than "sexual," that is not enough to remove the conduct from the Policy on Sexual Misconduct's ambit. Id. ¶ 155. Finally, the arbitrator concluded that Walter "still received due process because Grace, Silverblatt and the "Step Three" grievance provided Walter 'an opportunity to be heard.'" Id. ¶ 157.

## LEGAL STANDARD

A complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) where it does not contain enough factual allegations to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the court is required to accept all material facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Id. "In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111, 113 (2d Cir. 2010) ("[w]hen there are well-pleaded factual allegations, a court should assume their veracity and *then* determine whether they plausibly give rise to an entitlement to relief").

However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009); see also Iqbal, 556 U.S. at 678-79 ("A pleading that does nothing more than recite bare legal conclusions

is insufficient to unlock the doors of discovery"). Indeed, "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678. The "plausibility standard" requires "more than a sheer possibility that defendant has acted unlawfully." Id.

## DISCUSSION

### I.    Claims Against Defendant City University of New York ("CUNY")

The Eleventh Amendment bars lawsuits against a state or its agencies absent an explicit Congressional waiver of the state's immunity in the federal law at issue. Diaz v. City University of New York, 2014 WL 10417871, at *12 (S.D.N.Y. Nov. 10, 2014) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989)). Congress did not waive the states' Eleventh Amendment immunity from suit when it enacted section 1983. Quern v. Jordan, 440 U.S. 332, 345 (1979) ("[section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States..."); see also Will, 491 U.S. at 67. CUNY has long been considered "an arm of the state" of New York for purposes of sovereign immunity and as a result, Walter's section 1983 claims against CUNY, as opposed to the individual defendants, are barred. Diaz, 2014 WL 10417871, at *12; see also Skalafuris v. City of New York, 444 F. App'x 466, 468 (2d Cir. 2011); Clissuras v. City of New York, 359 F.3d 79, 82 (2d Cir. 2004).

### II.    Walter's Substantive Due Process Claim

Walter claims he has adequately alleged Defendants' employment-related conduct was "arbitrary, irrational, or motivated by bad faith" and "discernable from the actions taken by a private employer." Pl. Opp. Br., ECF No. 32, at 19-22. Walter asserts instead that Defendants' conduct rises to the level of "affirmative state action" actionable under the substantive due process doctrine. Id. On the other hand, Defendants contend Walter's substantive due process

claim (i) "is premised on the same allegations [Plaintiff] asserts in support of his procedural due process . . . claims" and (ii) in any event, is based on acts that "could have been taken on behalf of a private employer." Defs.' Br, ECF No. 31, at 24.

"The doctrine of substantive due process protects the individual against certain government actions regardless of the fairness of the procedures used to implement them," McClary v. O'Hare, 786 F.2d 83, 88 (2d Cir. 1986), but the scope of the doctrine "is very limited," Doe v. United States Merchant Marine Acad., 307 F. Supp. 3d 121, 156 (E.D.N.Y. 2018) (citing Washington v. Glucksberg, 521 U.S. 702, 720 (1997)). A plaintiff must establish "not only government action but also that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005); see also Rosa R. v. Connelly, 889 F.2d 435, 439 (2d Cir. 1989) (the challenged government decision must be "arbitrary or irrational or motivated by bad faith").

However, "[w]here the government's control is lessened, so is its duty, and its failings are less likely to be of constitutional proportions cognizable under section 1983." McClary, 786 F.2d at 88-89. For example, "[t]he substantive component of the Due Process Clause does not provide a remedy to a public employee that would not be available to a private employee subject to identical conduct by his employer." Id. at 89 (no substantive due process claim with respect to a public employee's decedent's wrongful death claim against the decedent's government employer). Instead, to adequately plead a substantive due process claim, the alleged government conduct must be "uniquely governmental" in character and "sufficiently severe . . . as to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights." Id. at 88-89 & n.6; see also Cherry v. N.Y.C. Housing Auth., 2017 WL 4357344, at *29 (E.D.N.Y. Sept. 29, 2017) (where government employees fabricated statements leading to

termination of Plaintiff's employment, "such conduct is not the type of abuse of government power necessary to state a substantive due process claim"); Bertram v. Metropolitan Transp. Auth., 2014 WL 748933, at *8 (S.D.N.Y. Feb. 26, 2014) (plaintiff did not plead "uniquely governmental" action where "the gravamen of plaintiff's allegations is that Defendants harassed him and disciplined him on numerous occasions"); North Star Contracting Corp. v. Long Island R.R. Co., 723 F. Supp. 902, 911 (E.D.N.Y. 1989) ("A substantive due process right is not implicated . . . where the only tie the government has to the case is the fact that it is one of the parties").

Walter's complaint does not plausibly allege a substantive due process violation. At its core, the complaint alleges Defendants are constitutionally liable for employment-related actions that could just as well be imputed to a private employer. Walter was a professor at a state-run educational institution. However, the fact that the College is state-run is only a qualifier, it is not the institution's defining feature, and as a result, Walter's allegations do not rise to the level of "uniquely governmental" conduct. Indeed, Walter's attempts to distinguish his case from the facts of McClary are misplaced. Walter argues that unlike McClary, he does not bring a claim "sounding in tort," but has instead "alleged that the Individual Defendants utilized their powers as state officials to harm him." Pl. Opp. Br, ECF No. 32, at 23. However, *just like* McClary, "the actions of which Plaintiff complains—however egregious they may be—are the same kinds of employment actions that any employer, whether public or private, could potentially take with respect to an employee," and do not constitute an abuse of power unique to the College's role as a state-run entity. Mancuso v. Village of Pelham, 2016 WL 5660273, at *17 (S.D.N.Y Sept. 29, 2016). Defendants are not alleged to have abused "some power unique to [their] role as [government officials]." Perfetto v. Erie Cty. Water Auth., 2006 WL 1888556, at *10

(W.D.N.Y. Jul. 7, 2006). Rather, Defendants allegedly engaged in tortious acts akin to wrongful termination or breach of employment contract, and the mere fact that Walter was employed by a state-run institution does not "transform" these allegations into substantive due process violations. Thomas v. New York City Dept. of Educ., 938 F. Supp. 2d 334, 354 (E.D.N.Y 2013).

Moreover, even if Defendants' alleged conduct was "uniquely governmental," as alleged in the complaint, it was careless, slip-shod and perhaps unbalanced but the allegations do not describe conduct so egregious or motivated by otherwise "illegitimate…concerns" so as to shock the conscience or interfere with rights implicit in the concept of ordered liberty. John E. Andrus Memorial, Inc. v. Daines, 600 F. Supp. 2d 563, 586 (S.D.N.Y. 2009). Walter's substantive due process claim is therefore dismissed.

III.     Walter's Procedural Due Process Claims

  a.   *Documents That May Be Considered*

Defendants attach the following documents as exhibits to their motion to dismiss: (i) the CBA between CUNY and the PSC, (ii) the CUNY Policy on Sexual Misconduct, (iii) emails exchanged between Walter and Rountree, (iv) Rountree's investigative report on Walter's conduct, (v) Walter's letter of termination, (vi) the "Step One" grievance decision, (vii) the "Step Two" grievance decision, (viii) the "Step Three" arbitration opinion and award, and (ix) the AAA Employment Arbitration Rules and Mediation Procedures. Defendants argue that the Court should consider all of these documents because they are "integral to the complaint" and "courts have considered agency decisions that penalize public employees in resolving due process challenges to those actions." See Zynger v. Dep't of Homeland Sec., 615 F. Supp. 2d 50, 61 (E.D.N.Y. 2009), aff'd 370 F. App'x 253 (2d Cir. 2010) (finding Disciplinary Review Board's decision "integral to the complaint" because "Plaintiff's claims arise out of her firing,

which was upheld by the [Board] decision" and because the "complaint alleges flaws in the [Board] decision and proceedings"). On the other hand, Walter argues that mere discussion of documents in a complaint or even including short quotations from them does not constitute incorporation by reference. Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989).

As a general matter, the Court "must limit its analysis to the four corners of the complaint" in deciding a motion to dismiss. Adams v. New York State Educ. Dept., 2010 WL 624020, at *19 (S.D.N.Y. Feb. 23, 2010) (citing Kopec v. Coughlin, 922 F.2d 152, 154-55 (2d Cir. 1991)). The complaint, however, is "deemed to include . . . any statements or documents incorporated in it by reference," as well as any document upon which the Plaintiff solely relies and which is integral to the complaint, even if not incorporated by reference, without converting the motion to dismiss into a motion for summary judgment. Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995). Indeed, even if a document is not incorporated by reference in the complaint, so long as the "plaintiff has actual notice" of the document or "has relied upon [it] in framing the complaint" the document may be considered. Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 44 (2d Cir. 1991); see also Bancorp Servs., LLC v. Am. General Life Insur. Co., 2016 WL 4916969, at *2 n.3 (S.D.N.Y. Feb. 11, 2016). Compare with Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint"). However, before materials outside the complaint may become the basis for dismissal (i) it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and (ii) it must be clear that there exists no material disputed issue of fact regarding the relevance of the document. DiFolco, 622 F.3d at 113 (reinstating claim where district court considered documents outside

the complaint to "assay[] the weight of the evidence…and improperly chose between reasonably competing interpretations" to dismiss the complaint).

The complaint relies extensively upon the terms and effect of the CUNY Policy on Sexual Misconduct. Indeed, the complaint devotes 15 paragraphs to discussion of the Policy, quotes from it liberally and relies exclusively on its terms to plead its vagueness claim. The Court will thus consider the Policy itself, rather than limit its consideration to the excerpts cited in the complaint. Moreover, the CBA and AAA Arbitration Rules and Mediation Procedures spell out the "rules of the road" for Walter and the College and thus effectively function like a contract incorporated by reference in a breach of contract claim. Plaintiff had actual notice of these documents because Walter's pre- and post-deprivation process claims rely at least in part on the Defendants' failure to abide by their terms. Cortec Indus., Inc., 949 F.2d at 44. Finally, considering these documents would not require the court to weigh any evidence or "cho[o]se between reasonably competing interpretations." DiFolco, 622 F.3d at 113. In sum, there is no dispute regarding the accuracy of these documents and thus they merit the Court's consideration.

However, at this stage, the Court will not consider the full set of reports and decisions concerning Walter's termination, the emails exchanged between Rountree and Walter or Walter's letter of termination. Defendants claim that like Zynger, in which the Court considered an administrative decision on a motion to dismiss, Walter's "claims arise out of [his] firing, which was upheld by [three different decisions] and because the complaint alleges flaws in [those] decision[s] and proceeding[s]," the decisions themselves are "integral to the complaint." 615 F. Supp. 2d at 61. Zynger dealt with a *single* administrative decision, rather than the *four separate decisions and reports* issued in Walter's case. As alleged in the complaint, the four decisions and reports are factually inconsistent and reveal "material disputed issues of fact" and

potential inaccuracies rendering them inappropriate for consideration at this stage. DiFolco, 622 F.3d at 111. Cf. Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("Courts routinely take judicial notice of documents filed in other courts ... *not for the truth of the matters asserted* in the other litigation but rather to establish the fact of such litigation" (emphasis added)). If the Court considers these reports and decisions (as well as the emails and letter of termination) without providing Walter the opportunity to seek discovery regarding their factual bases and drafting processes, the Court would effectively be in the position of weighing an incomplete evidentiary record before ruling on a 12(b)(6) motion. At the motion to dismiss stage, the Court is constrained to evaluating the legal feasibility of the complaint and thus will not consider these documents.

### b. *Whether the Policy is Unconstitutionally Vague*

Walter argues that the Policy is vague and failed to put him on notice that the conduct as alleged in the complaint—the application of "therapeutic pressure" to his neck for less than one minute on two occasions, one voluntary and unsolicited, the other on request—was proscribed and thus violates his due process rights. To that end, Walter contends that the terms "sexual harassment" and "sexual nature" in the policy are "impermissibly vague." However, Defendants argue Walter's conduct, which according to Defendants includes "the actions as found by the arbitrator in the Step Three Decision," fell squarely within the Policy's prohibition on sexual misconduct and specifically the prohibition on "inappropriate or unwelcome physical contact or suggestive body language, such as touching, groping, patting . . ." Farrell v. Burke, 449 F.3d 470, 490 (2d Cir. 2006) (citing Birzon v. King, 469 F.2d 1241, 1243 & n.4 (2d Cir. 1972)).

The Supreme Court recognizes two independent grounds on which a statute or policy "may be so vague as to deny due process of law." Thobideau v. Portuondo, 486 F.3d 61, 65 (2d

Cir. 2007). First, the statute must "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." Id.; see also Farrell, 449 F.3d at 483 (as-applied vagueness challenges do not require the Court to determine "whether the *actual* plaintiff knew that his or her conduct was prohibited" (emphasis added)). Second, "a law is unconstitutionally vague if it authorizes or even encourages arbitrary or discriminatory enforcement." Thobideau, 486 F.3d at 66 (statutes must be specific enough "to avoid resolution on an *ad hoc* and subjective basis").

Though a "statute or regulation is not required to specify every prohibited act" and "may instead embody flexibility and reasonable breadth," it must nevertheless "set reasonably clear guidelines...to prevent arbitrary and discriminatory enforcement." Perez v. Hoblock, 368 F.3d 166, 174-75 (2d Cir. 2004); United States v. Rybicki, 354 F.3d 124, 142-43 (2d Cir. 2003) (the law, as applied to the specific conduct at issue, must define what is prohibited "with sufficient definiteness" such that the policy will "channel the discretion" of those who are charged with enforcement). This modest flexibility is "necessary to allow for the drafting of statutes and regulations that are both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." Piscottano v. Murphy, 2005 WL 1424394, at *11 (D. Conn. June 9, 2005) (citing Arnett v. Kennedy, 416 U.S. 134, 159-60 (1972)). With respect to statutes which mandate civil rather than criminal penalties, "the Supreme Court has expressed greater tolerance of enactments with civil . . . penalties because the consequences of imprecision are qualitatively less severe." Perez, 368 F.3d at 175 (citing Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1982)). To that end, "[s]chool disciplinary rules need not be as detailed as a criminal code," A.F. by Fenton v. Kings Park Cent. Sch. Dist., 341 F. Supp. 3d 188, 198 (E.D.N.Y. 2018),

in part because "maintaining security and order in the school requires *a certain degree* of flexibility in school disciplinary procedures," Bethel Sch. Dist. No. 43 v. Fraser, 478 U.S. 675, 686 (1986) (emphasis added).

The Policy Walter supposedly violated prohibits "sexual harassment, gender-based harassment and sexual violence against CUNY students, employees or visitors." Complaint, ECF No. 1, ¶ 70. Sexual harassment includes "unwelcome conduct of a sexual nature…including physical conduct of a sexual nature" such that it creates a "hostile environment,"[2] evaluated from the perspective of a reasonable person in the position of a complainant. Id. ¶ 71. Moreover, conduct is unwelcome if the individual did not request or invite it and considered the conduct to be undesirable or offensive. Id. ¶ 72. For example, "conduct that might constitute sexual harassment depending on *the totality of the circumstances*" includes "inappropriate or unwelcome physical contact or suggestive body language, such as touching, groping, patting pinching, hugging, kissing or brushing against an individual's body" as well as "undue and unwanted attention, such as repeated inappropriate flirting, staring or making sexually suggestive gestures." Id. ¶ 74.

i. Relevant Conduct

Defendants insist that the relevant conduct for purposes of an as-applied vagueness analysis is the conduct as determined by the "Step Three" arbitrator post-deprivation. However, the cases Defendants cite consider "charged" conduct in criminal cases, Defs.' Br., ECF No. 31, at 20 (citing United States v. Smith, 985 F. Supp. 2d 547, 593 (S.D.N.Y. 2014)), and, the civil cases Defendants cite confine their analysis of relevant conduct to "the facts as presented by the

---

[2] A "hostile environment" exists where the "conduct is sufficiently serious that it alters the conditions of, or has the effect of substantially interfering with, an individual's educational or work experience by creating an intimidating, hostile, or offensive environment." Complaint, ECF No. 1, ¶ 71.

Plaintiffs as true," A.F. by Fenton, 341 F. Supp. 3d at 198, as well as "actual conduct . . . not with respect to hypothetical situations at the periphery of the statute's scope," VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 189 (2d Cir. 2010). Therefore, in a civil case, on a motion to dismiss, Walter's "actual" conduct for purposes of the Court's vagueness analysis is the conduct *as alleged in his complaint*. Accordingly, this Court accepts as true (i) that "while sitting at his piano Walter began to wince and rub his neck, while verbalizing his pain and discomfort," (ii) that the student "offered to use the same application of pressure points [she learned from her grandmother] to Walter's neck to provide relief," (iii) that the student then "stood behind Walter and using the tips of her thumb and index fingers applied pressure to Walter's neck" for approximately 30 seconds, (iv) that Walter asked the student to apply pressure once again at the end of the lesson "for less than one minute," and (v) that as a result of this conduct, the College determined Walter violated the Policy on Sexual Misconduct and terminated him.

        ii. Whether A Person of Ordinary Intelligence Would Have A Reasonable Opportunity to Know What Conduct the Policy Prohibits

Walter states a plausible claim that a person of ordinary intelligence would not have a reasonable opportunity to understand that the College's Policy prohibits the voluntary and initially unsolicited application of therapeutic pressure to one's neck for less than a minute and that such conduct warrants termination. The cases cited by Defendants do not compel a contrary conclusion. Though the cases Defendants cite suggest schools enjoy wide latitude in fashioning disciplinary policies, at first blush rendering them virtually impenetrable to a vagueness challenge, these cases typically deal with the conduct of high school students, and the penalties are often some modest term of suspension. For example, in Fraser, a high school student was

18

suspended for two days for violating the school's "disruptive-conduct rule" and making a sexually explicit speech during an assembly. The Supreme Court concluded that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures" and "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." 478 U.S. at 686. Accordingly, "[t]wo days' suspension from school does not rise to the level of a penal sanction calling for the full panoply of procedural due process protections applicable to a criminal prosecution." Id.

Unlike Fraser, Walter's conduct, on the face of the complaint, is far more innocuous and yet his consequence far more severe. On the one hand, there is a high school student (i) charged with violating a disciplinary policy prohibiting "[c]onduct which materially and substantially interferes with the education process . . . including the use of *obscene, profane* language and gestures" (ii) by giving a speech referring to another student "in terms of an *elaborate, graphic and explicit* sexual metaphor," (iii) who received a two-day suspension. Id. at 678. On the other hand, there is a professor of almost 10 years with an unblemished record (i) charged with violating a policy that prohibits "unwelcome [physical] conduct of a sexual nature" including "inappropriate or unwelcome physical contact or suggestive body language" (ii) for receiving a voluntary application of therapeutic neck pressure for less than one minute, (iii) who was terminated from his employment. As-applied vagueness challenges must be analyzed with respect to the specific conduct at issue, and thus the Court finds that the deference conferred to the high school's disciplinary process in Fraser is not warranted here. At virtually every turn, the facts, policies and penalties are distinct between the two cases. Perhaps most significantly,

Walter faced termination, not a two-day suspension. With a penalty that serious, even in the context of a school policy, greater clarity is necessary.[3]

Defendants also point to a single district court case in Colorado declining to find that a similar sexual misconduct policy was unconstitutionally vague. <u>Vanderhurst v. Colorado Mountain College Dist.</u>, 16 F. Supp. 2d 1297, 1305 (D. Colo. 1998). However, that one case does not control the Court's decision with respect to Mr. Walter. <u>First</u>, in <u>Vanderhurst</u>, the Court considered the vagueness challenge on summary judgment, with the benefit of a more developed factual record. <u>Id</u>. <u>Second</u>, <u>Vanderhurst</u> dispensed with plaintiff's vagueness challenge in three sentences only stating that the policy did not violate the Supreme Court's vagueness test but declining to provide any analysis or explanation as to why the policy *as applied* to plaintiff's conduct was not unconstitutionally vague. <u>Id</u>.

Unpersuaded by the cases cited by Defendants, the Court finds that Walter states a plausible claim that the College's Policy on Sexual Misconduct would not "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" as applied to his particular alleged conduct. <u>Thobideau</u>, 486 F.3d at 65. The Policy prohibits unwelcome physical acts that are "sexual" in nature. A person of ordinary intelligence would plausibly be inclined to understand that where alleged conduct is undertaken for a medical or therapeutic purpose such conduct is decidedly not "sexual" in nature. Indeed, just as the physical acts comprising mouth-to-mouth resuscitation would surely be deemed sexual in nature *if not for*

---

[3] Similarly, Defendants cite <u>A.F. by Fenton</u> where high school students received a one-day suspension after they received a text message containing a sexually explicit video. 341 F. Supp. 3d at 198. However, there the Court concluded on somewhat of a technicality that although the students were punished for conduct falling outside the scope of the school's disciplinary policy, Plaintiff's complaint failed to state a vagueness claim because the complaint did not allege that the disciplinary policy failed to provide notice of what behavior was proscribed, only that the Policy was erroneously applied to them. <u>Id</u>. at 199. <u>A.F. by Fenton</u> is thus procedurally inapposite. Here, the issue is not erroneous application of a policy but whether Walter has plausibly alleged that the Policy, as applied to his conduct, was too vague to provide him with constitutionally adequate notice that his conduct was proscribed.

*the fact that they are performed for a specific medical purpose*, here, where the alleged conduct came after an explicit and voluntary offer to relieve physical pain, it is plausible that a person of ordinary intelligence may not understand that a policy on sexual misconduct proscribes such therapeutic touching.[4]

      iii.  Whether the Policy Authorizes or Encourages Arbitrary or Discriminatory Enforcement

Walter also states a plausible claim with respect to the second prong of the vagueness analysis—the College's Policy on Sexual Misconduct, as applied to his alleged conduct, "authorizes or even encourages arbitrary and discriminatory enforcement." Id. at 65-66. The Policy defines "sexual activity," "sexual harassment," "sexual assault," "sexual misconduct" and "sexual violence," but the Policy does not define the term "sexual" as a standalone term. Accordingly, the Title IX coordinator maintains discretion to imbue the term "sexual" with her own personal gloss, rather than some more objective, even if imperfect, standard. A sexual misconduct policy that leaves ambiguous whether physical touching for a medical or therapeutic purpose is, nevertheless, "sexual," is a policy vulnerable to arbitrary enforcement.

Though the Court appreciates the need to craft statutes and policies with sufficient breadth so as not to "convert the Constitution into an insuperable obstacle" to school policymaking, id. at 69, without language appropriately cabining the term "sexual," the scope and reach of the Policy is too nebulous and the Title IX coordinator's authority too unfettered. To be clear, there are circumstances in which whether or not conduct is "sexual" in nature cannot be disputed and indeed, the Policy's definition of "sexual activity" refers to some of this more

---

[4] There are numerous examples where some form of physical touching may be medically necessary or suggested. Perhaps a student is injured on campus and requires assistance fashioning a bandage or applying ointment or some other medication—all acts that require physical touching for a medical or therapeutic purpose. As alleged in the complaint, Walter received a similar form of physical touching that is not addressed explicitly in the Policy.

21

explicit conduct.  However, the gray areas, lacking an adequate definitional anchor, leave victims *and* the accused most vulnerable to arbitrary and inconsistent enforcement, uncertain of when a school official may decide physical contact rises to the level of a Policy violation or should be dismissed as a mere "misunderstanding."  Given the facts pleaded in this complaint, a Policy on Sexual Misconduct without sufficient guidance on the word "sexual" as a standalone term leaves open the possibility that physical touching performed for a purported therapeutic purpose can result in termination without warning and thus encourages arbitrary or discriminatory enforcement.  Walter has pleaded facts sufficient to state a plausible claim that the Policy, as applied to the conduct alleged in the complaint, is vague because (i) it does not provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits and (ii) it authorizes or encourages arbitrary or discriminatory enforcement.

    *c.  Pre-Deprivation Procedural Due Process*[5]

---

[5] Defendants argue Walter abandoned his pre- and post-deprivation procedural due process claims because they were not featured in his opposition brief.  However, of the two cases Defendants cite, one was decided on summary judgment, Esperanza v. City of N.Y., 325 F. Supp. 3d 288, 298 (E.D.N.Y. 2018), and in the single case Defendants cite ruling on a motion to dismiss, the Court's primary basis for dismissal was plaintiff's "failure to allege facts" to support their claim, and not plaintiff's cursory treatment of the claim in its opposition brief, Bilinski v. Keith Haring Found., Inc., 96 F. Supp. 3d 35, 47 & n.10 (S.D.N.Y. 2015); see also Simon v. City of New York, 2015 WL 2069436, at *2 (S.D.N.Y. May 4, 2015) (dismissing Plaintiff's section 1983 claims because "it is well established that private employers are not liable under Section 1983…unless the plaintiff proves that action pursuant to official policy of some nature caused a constitutional tort," while also noting "[p]laintiffs failed to respond to Defendants' arguments with respect to those claims, so those claims are deemed abandoned"); Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013) (dismissing a complaint that "contain[ed] no factual content regarding this [Monell] theory," while also noting plaintiff's motion papers did not address the Monell claim).

Indeed, "[a] court *may*, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed," Chamberlain, 986 F. Supp. 2d at 392 (emphasis added), and "[w]here abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and *circumstances viewed as a whole*, district courts may conclude that abandonment was intended, Jackson v. Federal Exp., 766 F.3d 189, 196 (2d Cir. 2014) (emphasis added).  Walter's pre-deprivation procedural due process claim is not the sort of "kitchen sink," meritless claim that warranted dismissal on 12(b)(6) grounds in Bilinki, Chamberlain or Simon.  Considering the *circumstances as a whole*, particularly counsel's discussion and representations at oral argument, the Court finds that Walter did not intend to abandon his pre- and post-deprivation procedural due process claims.  In ruling on Defendants' 12(b)(6) motion, Walter may stand on the pre- and post-deprivation procedural due process allegations in his complaint.

"In order to assert a violation of procedural due process rights, a plaintiff must 'first identify a property [or liberty] right, second show that the government has deprived him of that right, and third show that the deprivation was effected without due process.'" Doe v. United States Merchant Marine Academy, 307 F. Supp. 3d 121, 149 (E.D.N.Y. 2018) (citing Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington, 31 F.3d 1191, 1194 (2d Cir. 1994)).[6] "In the context of a public employee, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." Locurto v. Safir, 264 F.3d 154, 173 (2d Cir. 2001); see also Thompson v. New York City, 2013 WL 6409326, at *11 (S.D.N.Y. Dec. 9, 2013).

First, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). Notice "must do more than simply inform an aggrieved party of his entitlement to a hearing. Rather . . . notice must adequately inform the party as to what the critical issue of the hearing will be." Nnebe v. Daus, 184 F. Supp. 3d 54, 74 (S.D.N.Y. 2016) (citing Turner v. Rogers, 564 U.S. 431 (2011)). "The particularity with which alleged misconduct must be described [in a notice] varies with the facts and circumstances of the individual case . . . the degree of required specificity also increases with the significance of the interests at stake." Spinelli v. City of New York, 579 F.3d 160, 172 (2d Cir. 2009).

---

[6] Defendants do not dispute that Plaintiff had a property interest in his continued employment as an adjunct lecturer for the remainder of his term appointment with CUNY. Defs.' Br, ECF No. 31, at 11. Nor do Defendants dispute that Plaintiff had a protected liberty interest in his reputation. Id. Accordingly, the Court must consider only whether Plaintiff was deprived of those rights without due process of law.

Second, whether the "limited" opportunity to be heard pre-deprivation is constitutionally sufficient, *regardless of post-deprivation process afforded*, depends upon: (i) the nature of the private interest that will be affected by the official action, (ii) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (iii) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews v. Eldridge, 424 U.S. 319, 335 (1976); see also United States v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993) (finding the Mathews test "provides guidance" in assessing whether to "tolerate" anything less than "notice and a hearing" pre-deprivation); Patterson v. Couglin, 761 F.2d 886, 893 (2d Cir. 1985) ("Once a cause of action for a constitutional violation accrues, nothing that the state does subsequently can cut off the § 1983 claim"). A pre-deprivation hearing in the context of public employment "need not be elaborate." Cleveland Bd. of Educ v. Loudermill, 470 U.S. 532, 544 (1985) ("affording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays"); Locurto, 264 F.3d at 173 ("requiring more than notice of the charges, an explanation of the nature of the employer's evidence, and an opportunity for the employee to respond would impede the government's interest in quickly removing from service an unsatisfactory employee"); see also O'Conner v. Pierson, 426 F.3d 187, 198 (2d Cir. 2005). Indeed, Loudermill simply requires "the opportunity to present reasons, either in person or in writing, why proposed action should not be taken," 470 U.S. at 546, bearing in mind that pre-termination process "does not purport to resolve the propriety of the discharge, but serves mainly as a check against a mistake being made by ensuring there are

reasonable grounds to find the charges against employee are true and would support his termination," Locurto, 264 F.3d at 174.

i. Notice

In common parlance, Walter alleges he was effectively sandbagged by the College's Title IX coordinator, Defendant Rountree. During email correspondence prior to his in-person meeting, Rountree referred only to a "confidential matter of importance," and declined to inform Walter of the "critical issue" of the hearing, or that the meeting would even be anything like a hearing where Walter might be called upon to defend himself. Nnebe, 184 F. Supp. 3d at 74. Moreover, during Walter's in-person meeting he was verbally informed that "allegations had been made against him by a student alleging the use of unwelcome comments of a sexual nature and asking her to massage his neck while he lay on the couch" and told who the student was. Compl., ECF No. 1, ¶ 95. However, Rountree allegedly did not inform Walter that the meeting was "an investigatory interview, that it was disciplinary or that it was official," nor did she provide Walter with a "written summary of the allegations" against him. Id. ¶¶ 95, 98. Notably, Walter was not aware that he was facing termination during the meeting, an omission only exacerbated by the fact that just prior to the meeting, when Walter asked to conduct the meeting over the phone to accommodate his health condition, he stated "my employment is not in jeopardy, so I don't understand why I am being summoned with no explanation." Id. ¶ 86.

First, Walter's email exchange with Rountree was too vague and not "reasonably calculated" to apprise him of the "pendency of the action" and "afford [him] an opportunity" to respond. Mullane, 339 U.S. at 314. Being summoned suddenly to discuss a "confidential matter of importance" says nothing of the substance of any charges and affords no notice of "the critical issue of the hearing." Nnebe, 184 F. Supp. 3d at 74. To the contrary, notice of a "confidential

25

matter of importance" does not even suggest there are any charges or that there will be some proceeding akin to a hearing. Second, the verbal notice of charges Walter received during the in-person meeting with Rountree might have informed Walter of the "critical issue of the hearing"—allegations of unwelcome sexual touching and sexual comments—but, according to the complaint, Walter left the meeting "completely confused about what was going on" because he was not informed that the meeting was an "investigatory interview" or that it was "disciplinary" and *might result in termination*. Where the only notice Walter received of the charges against him (i) was delivered simultaneously with his opportunity to be heard, and (ii) failed to apprise Walter that he faced termination, such notice is not "reasonably calculated" to afford an opportunity, even if limited, to respond. Walter cannot realistically be expected to develop an appropriate, albeit limited, response to charges of sexual misconduct that threaten his livelihood and professional standing at the precise moment he is finally notified of those charges. Accordingly, Walter was entitled to notice sufficient to apprise him of all relevant details concerning his charges, including possible penalties, and with some time between the notice and the opportunity to respond.

    ii.  Limited Opportunity to be Heard

Although the opportunity to be heard pre-deprivation is limited in the context of public employment, the employee is nevertheless entitled to *some* opportunity to respond. According to the complaint, once Walter was notified of the charges against him, he had to respond immediately and was not informed whether he would have any subsequent opportunities before Rountree issued a decision. Moreover, Walter was never asked to provide the names of any potential witnesses. Under Mathews, Rountree's sandbagging (i) improperly minimized "the nature of the private interest that will be affected"—loss of Plaintiff's livelihood—(ii) ignored

26

"the risk of an erroneous deprivation" by interviewing only the complainant's witnesses and declining to seek out the complainant's lesson recordings—unassailable evidence of what did, or did not occur during the lesson—without attempting to compile a more balanced factual record, and (iii) focused almost exclusively on "the Government's interest." The loss of one's livelihood must loom large in a Mathews analysis, and Plaintiff was entitled to a more robust opportunity to be heard before his termination—it is not enough to point to Walter's three-step process post-termination as a suitable antidote. Loudermill, 470 U.S. at 543 ("[T]he significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood"); Patterson, 761 F.2d at 893.

In Faghri v. University of Connecticut, Defendants were entitled to summary judgment on Plaintiff's procedural due process claim where a University dean was summoned to a face-to-face meeting, "received oral notice of the university's intent to remove him from the deanship, a brief explanation of the university's evidence, and an opportunity to be heard . . . in that meeting and immediately afterward" there was no due process violation. 621 F.3d 92, 100 (2d Cir. 2010). However, in Faghri, the Plaintiff faced a demotion—removal of his deanship—not total loss of employment. Id.; see also Ciambriello v. Cty. of Nassau, 292 F.3d 307, 320 (2d Cir. 2002) ("[Plaintiff's] interest in not being demoted…is undoubtedly less significant than a public employee's interest in not being dismissed altogether [but] the private interest [in not being demoted] is still substantial"). Moreover, the Court noted in Faghri that the Plaintiff had an opportunity to respond both at the face-to-face meeting *and* after the meeting. Faghri, 621 F.3d at 100. Here, accepting the allegations in the complaint as true, Walter was not made aware of any subsequent opportunity to respond or supplement his response following the in-person meeting with Rountree.

27

Even in Zeyer v. Board of Education, where the court noted "[i]n the case of an employee with access to grievance procedures under a CBA, generally there is no due process violation where...pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in the collective bargaining agreement," 98 F. Supp. 3d 425, 435 (D. Conn. 2015) (citing Adams v. Suozzi, 517 F.3d 124, 128 (2d Cir. 2008)), the Court nevertheless denied Defendants' motion to dismiss because based on the allegations in the complaint, it was "entirely possible" that Plaintiff received notice "after her employment status had already been changed, or only a day or two beforehand" and never had a hearing. Here too, the allegations in the complaint make it "entirely possible," indeed, plausible, that because Walter's notice and opportunity to respond came simultaneously, he was deprived of even a *limited* opportunity to be heard. Moreover, here, Walter faced termination whereas in Zeyer the Plaintiff faced a change in employment status, not outright termination. Accordingly, Walter states a plausible procedural due process claim: he was entitled to a more meaningful opportunity to be heard after receiving notice, and Defendants' motion to dismiss Plaintiff's procedural due process claim should therefore be denied. [7]

The substantial nature of Walter's interest in retaining his livelihood combined with the dearth of information Walter received regarding any subsequent opportunity to be heard compel

---

[7] There are numerous other cases in this Circuit where constitutionally adequate pre-deprivation process is distinguishable from the facts Walter alleges in his complaint. See, e.g., United States v. Barrett, 32 F. App'x 612, 614 (2d Cir. 2002) (Plaintiff had *20 days* to respond to pre-deprivation notice of forfeiture); Zynger, 370 F. App'x at 255 (plaintiff given two opportunities to offer an alternative explanation for positive drug test results first during a meeting with a medical review officer and later in a meeting with her supervisor and even if plaintiff "may quarrel with defendants' rejection of her explanation" she was provided with sufficient opportunity to be heard); Chernoff v. City of New York, 2009 WL 816474, at *3 (E.D.N.Y. Mar. 26, 2009) (No due process violation where plaintiff received written notice of charges in April 2003 and again in January 2004, and thus plaintiff had adequate opportunity to respond); DeMasi v. Benefico, 567 F. Supp. 2d 449 (S.D.N.Y. 2008) (No due process violation where plaintiff was ordered to report for "light transitional" work duty following injury, plaintiff in fact returned to work, was able to perform "light transitional" duties, was informed via a subsequent letter that his benefits would be terminated unless plaintiff provided medical evidence to the contrary).

the Court to conclude that Walter has stated a plausible pre-deprivation procedural due process claim. Though the government's interest in protecting the CUNY student body from unwelcome comments or conduct of a sexual nature is undoubtedly significant, Walter's interest in his livelihood "cannot be gainsaid" or otherwise minimized. Loudermill, 470 U.S. at 543 (finding a violation of due process where employee was terminated without a pre-deprivation opportunity to be heard for lying about his *criminal* record). Rountree did not release the report that ultimately resulted in Walter's termination until two weeks after the in-person meeting and during that time Rountree only interviewed complainant's witnesses but did not interview or much less inquire into any witnesses Walter might have been able to provide. Rountree did not even secure available recordings of Walter's lessons with the complainant in finalizing her report. A constitutionally appropriate limited opportunity to respond would provide Walter an explicit opportunity to supplement his responses following the meeting. Without such an opportunity, and in light of the penalty he faced, Walter has alleged a plausible pre-deprivation procedural due process claim.[8]

---

[8] With respect to post-deprivation process, CBA-mandated arbitration procedures provide adequate post-deprivation process for constitutional purposes. O'Connor v. Pierson, 426 F.3d 187, 198 (2d Cir. 2005) ("CBA-mandated grievance procedures are routinely (though not always) held to provide adequate post-deprivation process"). Indeed, in Harhay v. Town of Ellington Bd. of Educ, 323 F.3d 206 (2d Cir. 2003), the Court found that where the CBA governing plaintiff's employment established a grievance and arbitration procedure, which the plaintiff took advantage of and pursued arbitration, were sufficient to satisfy due process. See also Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir. 2002); Wilson v. New York, 2017 WL 9674497 (E.D.N.Y. Jan. 24 2017).

After Plaintiff's termination he exercised his right to a three-step grievance process culminating in arbitration. Typically, grievance procedures pursuant to a CBA "provide adequate post-deprivation process." O'Connor, 426 F.3d at 198. Here, Plaintiff's post-deprivation three-step de novo process was likely adequate, but that does not cure any and all pre-deprivation deficiencies. Indeed, Plaintiff was entitled to "notice, and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." Locurto, 264 F.3d at 173. Even if "a full adversarial hearing is provided afterwards," Plaintiff was still entitled to "a limited opportunity to be heard" pre-deprivation, and Rountree's simultaneous notice and hearing procedure was likely inadequate. See also Faghri, 621 F.3d at 99 ("The due process clause requires a government employer to provide 'notice and opportunity for a hearing *before terminating* an employee with a protected property interest in his employment (emphasis added)).

## CONCLUSION

The Court fully appreciates the concerns of the College about the conduct of its teaching faculty and administration and the need for a strict and sensible Policy on Sexual Misconduct. Indeed, allegations of sexual harassment must not be taken lightly and the Court does not quarrel with the College's well-intentioned efforts to enforce its Policy. But, even well-intentioned, aggressive enforcement must respect constitutional assurances of fairness and due process. Given the facts alleged in this case, and despite the limited process due in the public employment context and the flexibility typically afforded to school disciplinary policies, Walter has alleged plausible vagueness and pre-deprivation procedural due process claims and the case should proceed toward some appropriate resolution or a trial on the merits. Accordingly, Defendants' motion is granted with respect to Walter's substantive due process claim and denied with respect to Walter's vagueness and pre-deprivation procedural due process claims. All claims against Defendant Queens College are dismissed.

SO ORDERED.

Dated: Brooklyn, New York
       June 3 , 2019

s/Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge